MRS. ADDIE KNIGHT ET AL V. THE CHICAGO CORPORATION ET AL.

No. A-425. Decided June 13, 1945.
Rehearing overruled July 18, 1945.
(188 S. W., 2d Series, 564.)

*Neel, King & Rachal, Hal F. Rachal* and *C. B. Neel,* all of Corpus Christi, and *Dan Moody* and *J. B. Robertson,* of Austin, for petitioners.

The Court of Civil Appeals erred in holding that the automatic termination of the lease did not become effective as a condition subsequent upon the execution without lessor's consent of a pooling agreement, which contained numerous assignments of undivided interests, and which was unauthorized. Sheffield v. Hogg, 124 Texas 290, 77 S. W. (2d) 1021; State v. Quintana Pet. Co., 134 Texas 179, 133 S. W. (2d) 112 and 134 S. W. (2d) 1016; Bashara v. Saratoga Ind. Sch. Dist., 139 Texas 532, 163 S. W. (2d) 631.

*Small, Arney & Small,* of Austin, and *Tarlton & Koch,* of Corpus Christi, for Richardson Pet. Co., and *Vinson, Elkins, Weems & Francis,* and *Tarlton Morrow,* of Houston, for First National Bank of Chicago and Republic Supply Co., all respondents.

MR. JUDGE HICKMAN, of the Commission of Appeals, delivered the opinion for the Court.

The petitioners brought this suit in the form of an action in trespass to try title for a decree that a certain oil, gas and mineral lease executed by them, as lessors, to Richardson Petroleum Company, as lessee, had terminated. The lease was dated October 7, 1940, and covered a tract of 320 acres in Neuces County. Simultaneously with the execution of the lease the lessee conveyed to lessors an oil payment out of the leased premises in the amount of $32,000 payable out of 1/32d of 7/8th of the production. At the termination of petitioners' testimony the court peremptorily instructed the jury to return a verdict in favor of respondents and judgment was rendered on the verdict returned in obedience to the instruction. The Court of Civil Appeals affirmed the case. 183 S. W. (2d) 666.

Prior to the filing of this suit the lessee drilled five producing oil wells on the leased premises. After four of these wells were drilled the lessee entered into a pooling agreement with The Chicago Corporation for the purpose of developing the natural gas resources and putting into effect a gas recycling program. Petitioners refused to join in such a program and brought this suit to declare a termination of the lease on the ground that the instruments executed by the lessee, hereinafter to be more fully noticed, constituted a violation of a provision of paragraph 8 of the lease against attempted assignments of undivided interests therein. Paragraph 8, as underscored by us for emphasis, reads as follows:

"8. The rights of either party hereto may be assigned in whole or in part, and the provisions hereof shall extend to the heirs, successors and assigns, but no change or division in ownership of the land, rentals or royalties, however accomplished, shall operate to enlarge the obligations or diminish the rights of Lessee; *provided, however, that the Lessee, its successors or assigns, shall not make any assignments of undivided interests, overriding royalties or oil payments without the written consent of the Lessors, save and except assignments to banks and oil well supply companies for the purpose of obtaining money, supplies and equipment to operate and develop the leased premises.* And provided further that the Lessee herein shall not assign said acreage in tracts of less than eighty (80) acres, which said 80-acre tracts shall constitute a minimum basis for assignment. In the event Lessee, its successors or assigns, should attempt to *assign any undivided interests, overriding royalty or oil payments without the written consent of the Lessors, other than assignments to banks and oil field companies for the procurement of money, supplies and equipment for the operation and development of the leases premises, or should attempt to assign any tract or tracts of less than 80 acres, this lease shall ipso facto terminate as to the interest so assigned, as well as all of the remaining interest owned by the person or corporation making such assignment.* In the event of any assignment or assignments of rights or privileges or interests under this lease, Lessee agrees to mail within sixty (60) days after the execution and delivery of any such assignments, one copy of each of such assignments to all of the lessors named herein, or their assigns, at their post office addresses and failing so to do, said assignment or assignments shall not be binding upon Lessors or their assigns."

In the latter part of 1942 the lessee, Richardson Petroleum Company, and The Chicago Corporation, of which it is alleged

the lessee is the alter ego, formed a block or unit of leases including petitioners' 320 acre tract for the purpose of developing the natural gas resources thereof. To carry this program into effect two instruments were executed by them. The first was a gas processing and sales agreement between the lessees of various tracts in the unit and The Chicago Corporation. It provided that "it is understood and agreed that it will be necessary to secure the execution of the contract set forth in Exhibit 'A' by the various royalty owners who own royalty rights in the unitized area." The other instrument is the one referred to as Exhibit "A" and denominated a unitization agreement. It was to be executed by the lessors and lessees of the various tracts included within the pool as well as other owners of gas royalties therein. Petitioners declined to execute this instrument.

The parties had as their object the pooling of all of the leases in the area, but, if not, to pool as many thereof as possible, it being stipulated that The Chicago Corporation was not bound unless as many as sixty per cent of the royalty and mineral owners having title to sixty per cent interest in the leases executed the unit contract. Under the agreements a gas recycling plant was to be established by The Chicago Corporation and provisions were made with reference to the sale of natural gasoline, condensates and other products to be stripped from the gas. It provided for the method of stripping such products from the gas and for the return of the gas to the reservoir. Division of proceeds of the sale of the products, as between the various lessors and royalty owners, was primarily upon an acreage basis. The contracts related alone to the natural gas underlying the lands involved and not to oil or other minerals. They became effective in February, 1943, when the requisite number of operators and lessors had executed one or more of the counterparts of the agreements. The project is now in operation; gas is being processed and recycling is taking place, but no gas wells or input wells have been drilled on petitioners' land, neither has any of the equipment used in the recycling or processing operations been located thereon.

■ By this action petitioners seek to recover the leasehold estate, together with five producing oil wells of great value, not because their property has been damaged or they have suffered any pecuniary loss, but because they claim that paragraph 8 imposed a special limitation upon the estate and that their lessee violated a provision thereof by attempting to assign undivided interests therein, which automatically terminated the estate. Disclaimers have been filed and the status quo restored, but under the theory of law upon which petitioners rely that is

of no moment. If the parties to the lease bound themselves by language which can be given no other reasonable construction than one which works such result, it is the court's duty to give effect thereto by declaring a termination, but if there is any uncertainty in the language so as to make it ambiguous or of doubtful meaning, relief should be denied them. Decker v. Kirlicks, 110 Texas 90, 216 S. W. 385; Bouldin v. Gulf Production Co., 5 S. W. (2d) 1019, (error dismissed).

Of the several questions exhaustively briefed, none is more abstractly interesting than that of whether paragraph 8 should be construed as a special limitation or as a condition subsequent, but under our views expressed below that question is not reached.

■ Breaking the transaction into its parts and considering first the unitization agreement executed by the operators and some of the royalty owners, but not by petitioners, we think it clear that by its execution Richardson Petroleum Company violated no restriction of paragraph 8. That was an act not dealt with at all therein. Since the petitioners are seeking to recover for a claimed violation of a restriction against alienation, they must bring the act of their lessee strictly within the language of the restriction. Interpreting paragraph 8 strictly and in accordance with the literal meaning of the language there employed, we are led to the conclusion that the act of executing the unit contract was not dealt with at all therein. The first clause in that paragraph reads as follows:

"The rights of either party hereto may be assigned in whole or in part, and the provisions hereof shall extend to the heirs, successors and assigns, but no change or division in ownership of the land, rentals or royalties, however accomplished, shall operate to enlarge the obligation or diminish the rights of lessee; * * *."

■■ That language expressly authorizes the lessee to make assignments of its rights, either in whole or in part, without the consent of lessor. It was intended to apply only to assignments which could be made without the consent of lessors and not to assignments which could be made with their consent. It merely declared the rights incident to the ownership of a mineral lease. The unit contract under review undertakes to reduce the royalty of the lessors from the 1/8th to 1/16th and to extend the term of the lease "so long as gas can be produced from the unitized area in commercial quantities," which might be long after the term of the instant lease would otherwise expire. It would hardly be

contended that the lessee, without the consent of the lessor, would be authorized to execute such an agreement. Absent the express authority to do so, a lessee would have no right to pool the interests in the estate retained by the lessor with those of other lessors. Brown v. Smith, 141 Texas 425, 174 S. W. (2d) 43, Gulf Oil Corporation v. Marathon Oil Co., 137 Texas 59, 152 S. W. (2d) 711.

■ Immediately following the above clause and in the same sentence is a proviso introduced by the words *"provided, however,"* which are followed by the restrictive provisions. That proviso must be construed as a limitation or restraint upon the authority defined in the clause immediately preceding it. The words, *"provided, however,"* as used in this instrument, mean substantially the same as "but notwithstanding what is granted above." Since the right to assign defined in the first clause of the paragraph did not include the right to make a unit contract of the nature of the one before us, the restriction following the proviso has no reference to such contracts. The word "assignments" does not have two different meanings in the same paragraph. The parties undertook only to restrict the powers defined and not to enlarge thereon. To hold otherwise would be to make a restriction upon a power cover a broader field than the power itself. Stafford v. Wessel, 321 Ill. App. 183, 52 N. E. (2d) 605; Whitworth v. McKee, 32 Wash. 83, 72 Pac. 1046 Marioneaux v. Cutler, 32 Utah 475, 91 Pac. 355; People v. Sischo, 23 Calif (2d) 478, 144 Pac. (2d) 785, 150 A. L. R. 1431; Sears v. Childs, 309 Mass. 33, 35 N. E. (2d) 663. From the case last cited we quote:

"The word 'provided' in common speech naturally expresses a qualification, limitation, condition, or an exception respecting the scope and operation of words previously used. 'Although a proviso in statutes, contracts or wills not infrequently introduces new or independent matter, its true office and its general purpose is to restrict the sense or make clear the meaning of that which has gone before'."

Applying the foregoing to the language of paragraph 8, the conclusion is reached that unitization contracts were not dealt with therein at all. The restrictions were against the doing of those things which, absent such restriction, lessee could have done without lessors' consent.

Since the unitization agreement and the gas processing and sales agreement were but parts of the same plan and program, and since the latter made the former a part thereof by express reference and provided that it was "necessary to secure the exe-

cution" of the former, which petitioners have never executed, we question whether it is necessary for us separately to consider the latter agreement. But since it is the position of the petitioners, as we understand it, that, even if the unitization agreement was not violative of the restriction, still the gas sales contract was violative thereof, we feel called upon to pass on that question.

■ The purpose for which the lease in this case was executed is not a matter left to conjecture, for in its first paragraph is the recital that same was "for the purpose of investigating exploring, prospecting, drilling and mining for and producing oil, gas and all other minerals." By the acceptance of that lease the law imposed upon the lessee the obligation to develop and operate the leased premises for the purpose of producing and marketing gas or other minerals found in paying quantities thereon. W. T. Waggoner Estate v. Sigler Oil Co., 118 Texas 509, 19 S. W. (2d) 27; Grubb v. McAfee, 109 Texas 527, 212 S. W. 464.

■ Paragraph 8, the paragraph upon which petitioners rely in support of their right of recovery, expressly recognizes the right of lessee to make assignments of undivided interests "to banks and oil field supply companies for the purpose of obtaining money, supplies and equipment to operate and develop the leased premises." It cannot be assumed that petitioners intended to grant banks and oil field supply companies special rights because of any particular interest which they had in such institutions, but rather, we think, they were named because they are the institutions to which lessees usually resort for money or for supplies and equipment to enable them "to develop and operate the leased premises." It is not at all an unreasonable interpretation of paragraph 8, when viewed in the light of the purposes for which the lease was executed, to hold that assignments or interests in lessee's estate made for the purpose of developing and operating the lease were permissible without the consent of lessors. Such was the purpose of the agreement in this case. It is disclosed that, under the rulings of Federal and State Commissions, and because there was no market in this area for gas in its natural state, a recycling program could not be put in operation in this field unless several leases in the field were pooled, and that pooling agreements provided the only method for producing, processing and marketing the gas derivatives. It is significant that the term, "pooling agreement," was not employed in the provision prohibiting assignments. The proscribed assignments were of "undivided interests, overriding royalties or oil payments." As pointed out in the opinion of the Court of

Civil Appeals, such assignments are understood in the oil industry to be those which dilute the working interest and theretofore make it less likely that lessee will continue to operate same, all to the detriment of the lessors. The failure to name pooling agreements in the lease while specifically naming assignments which might impair development and production, gives emphasis to the view that, what petitioners intended to proscribe were assignments which might result in detriment to their royalty interests. The gas sales contract, in a sense, made lessees of other tracts owners of interests in the leasehold estate in petitioners' tract, but not in the sense that the likelihood of continued operation was lessened thereby. On the contrary, it was enhanced.

Our conclusion with reference to this matter is that it is a reasonable construction of the lease contract to hold that the parties did not intend to include interests created by the gas sales contract within the term "undivided interests" as used in paragraph 8. That construction is to be preferred over one which would bring about the inequitable results outlined early in this opinion.

The judgment decreed that the petitioners take nothing against certain parties, including some royalty owners made parties defendant by them. A judgment in a trespass to try title suit that plaintiffs take nothing divests title out of them and vests same in the defendants. Permiam Oil Co. v. Smith, 129 Texas 413, 107 S. W. (2d) 564. Petitioners complain of the form of this judgment. We cannot perceive how they have been injured thereby. By their pleadings they put in issue only the title to the 7/8th leasehold interest conveyed by them in the lease charged with the oil payment in their favor. The decree that they take nothing merely vests in the lessee and those holding valid interests under it that particular leasehold estate. Petitioners' rights to the oil payment and royalties have not been impaired by the judgment. A disclaimer has been filed by The Chicago Corporation and the lease is therefore freed of any claim by it under the agreements involved. No reason is therefore perceived for modifying the judgment.

The judgments of both courts below are affirmed.

Opinion adopted by the Supreme Court June 13, 1945.

Rehearing overruled July 18, 1945.